UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| BRO-TECH CORPORATION, <br> d/b/a THE PUROLITE COMPANY <br><br> Plaintiff, <br><br> v. <br><br> PURITY WATER COMPANY OF <br> SAN ANTONIO, INC., <br><br> Defendants. | § <br> § <br> § <br> § <br> § <br> § Civil Action No. 5:08-CV-00594-XR <br> § <br> § <br> § <br> § <br> § |

**PLAINTIFF'S MOTION FOR AN INJUNCTION
UNDER FEDERAL RULE OF CIVIL PROCEDURE 65**

Bro-Tech Corporation d/b/a The Purolite Company ("Purolite") moves for the entry of an Order enjoining Defendant/Counterclaim Plaintiff Purity Water Company of San Antonio, Inc. ("Purity Water") from transferring or encumbering the principal sum due and owing to Purolite by Purity Water.

**I.   Introduction**

Given Purity Water's sworn acknowledgement that it has lacked and continues to lack the money with which to pay Purolite and that it has used funds received in connection with the project in question to pay itself and others but not Purolite, and because Purity Water's own words and documents manifest that Purolite will prevail on the merits of its claim, Purolite is entitled to preliminary relief under Federal Rule of Civil Procedure 65.

**II.   Facts**

In July 2007, Purity Water ordered 43,420 pounds of Purolite's resin PD-206 from Purolite, in order to remove water from biodiesel fuel. The first 30,000 pounds, sent in two

shipments, were billed at $5.25 per pound. The last 13,420 pounds were billed at $4.80 per pound. The invoices for the sales reflect that the PD-206 was sold to Purity Water for shipment to the Marine Tank (Dunhill) Terminal at Mobile, Alabama. Each invoice informs Purity Water that failure to pay each invoice in full within 30 days results in an additional cost to Purity Water and that any claims regarding the merchandise must be made within five days of purchase.[1]

Only last month, Purity Water's COO swore that the PD-206 was ordered by and for and received by Purity Water; that the prices for the PD-206 and delivery and other charges contained therein were agreed to; and that the PD-206 was sold to Purity Water. Ex. A, Carrera Dep. at 54-61. Purity Water, in turn, invoiced Optimira Energy for the goods and services it provided. Ex. A, Carrera Dep. P-8. Mr. Carrera also acknowledged that the resin achieved its purpose; the biodiesel fuel, dewatered with the aid of Purolite's PD-206 purchased by Purity Water, in fact was sold for a sum in excess of $5.6 million. Ex. A, Carrera Dep. at 16-17, 61, 65 and P-2. And after the dewaterization process at the Dunhill facility, Purity Water's Dunhill Terminal business partners transferred 2,200 pounds of PD-206 to the Vopak Terminal in Houston, Texas to be used as the medium to remove water from biodiesel fuel in ten railroad cars of ASTM quality biodiesel. Ex. A, Carrera Dep. at 38-39, 192-193; P-22, P-24.

Purity Water had been a long-standing customer of Purolite. Prior to July of 2007, Purity Water had always paid Purolite the sums reflected on Purolite's invoices and within 30 days. Ex. A, Carrera Dep. at 23-24. In the case of the Dunhill Terminal project, however, Purity Water has paid not one cent to Purolite for the PD-206 resin and services that Purolite had provided to

---

[1] The three invoices and supporting documentation are Exhibits P-5, P-6, and P-7 to the deposition of Purity Water's Chief Operating Officer, Wesley R. Carrera ["Carrera Dep."]. Relevant portions of Mr. Carrera's deposition including selected exhibits are attached as Exhibit A. Per the invoices, Purity Water owes to Purolite the sum of $230,611 plus interest accruing at the rate of 1.5% per month since July of 2007.

2560460.1

Purity Water. Ex. A, Carrera Dep. at 34. This, despite the fact that Purity Water did receive payments from its business partners.

Specifically, in July 2007, Purity Water received $30,000 as a down payment for its services from its Dunhill Terminal business partners. Ex. A, Carrera Dep. at 70 and P-8 at 0025. Purity Water received an additional $15,300 on July 27, 2007. Ex. A, Carrera Dep. at 77 and P-8 at 0027; P-9 at 0201. On September 17, 2007, Purity Water received $75,000 that was wired into its account by its Dunhill Terminal business partner Greenfield Products. Ex. A, Carrera Dep. at 88-90; P-9 at 0199. Yet, not one penny of these sums was paid to Purolite.[2]

This failure to pay is made even more reprehensible by the fact that Purity Water was paid money that was specifically designated as payment to Purolite for Purolite's resin; yet, Purity Water used the money for its own purposes. On the morning of July 25, 2007, the same date that Purolite sold 13,420 pounds of PD-206 to Purity Water [Ex. A, Carrera Dep. at P-7], Purity Water's Dunhill Terminal business partners confirmed to Purity Water that they were wiring to Purity Water's bank account approximately 25% of the cost of the additional PD-206, as a deposit for Purity Water to immediately make a purchase order for Purolite's PD-206 [Ex. A, Carrera Dep. at P-16]. The money was in fact wired on that date. Ex. A, Carrera Dep. at P-9 at 0201. Purity Water's COO testified that although he had received the email describing the down payment and received the wire deposit for Purolite's PD-206, he disregarded instructions and

---

[2] This despite the fact that Purity Water profited from its business partners on each contract for PD-206 that it entered into with Purolite. Purity Water's Carrera acknowledged that Purity Water billed $6 per pound with a 5% (30 cents) discount for the Purolite PD-206 it had purchased from Purolite for $5.25 a pound, and that it passed on to its business partners the cost for hot-shot delivery billed to it by Purolite, plus additional sums. Ex. A, Carrera Dep. at 72-74, P-8. Similarly, although Purity Water was billed $4.80 a pound for the last shipment of PD-206, it billed its partners at the rate of $5.10 per pound. Ex. A, Carrera Dep. at 75-76, P-8, P-16. Thus, the sum of the monies that Purity Water has acknowledged receiving included its mark-up profit for doing nothing whosoever regarding the PD-206 product or its delivery apart from ordering it.

2560460.1

chose instead to "apply that money to the total outlying debt of the project," transmitting none to Purolite.[3] Ex. A, Carrera Dep. at 143-46.

Purity Water's Carrera has also testified that subsequent to the sale of the biodiesel, he had orally and in writing told Purolite in words or in substance that "when my Dunhill Terminal partners pay what they owe to me, I will pay Purolite what we owe to Purolite." Ex. A, Carrera Dep. at 214-15.

Inconsistent, dissembling, or mendacious, Carrera's testimony manifests that the alleged "defect" in the resin that is the subject of Purity Water's counterclaim has no bearing on Purity Water's failure to pay Purolite. To the contrary, Purity Water's failure to pay Purolite is blamed solely and exclusively upon Purity Water's Dunhill Terminal partners partially stiffing Purity Water. Carrera's testimony also evidences that Purity Water has chosen to pay its obligations to others to whom it owes money for the Dunhill Terminal project, but not to Purolite.

As troublesome as Carrera's sworn admissions may be, the trouble is exacerbated exponentially by the fact that he has sworn under oath that Purity Water does not have sufficient funds to pay Purolite. Carrera testified at his deposition on April 15, 2009:

> Q: Had there been a judgment against your company for $231,000 worth of the PD-206 -- even forget about the interest. Whatever, the $231,000 as of July 2008, could Purity Water have paid it?
>
> A: No. Not at that time.
>
> Q: Could it today?
>
> A: No, not at this time.

Ex. A, Carrera Dep. at 154-55.

---

[3] Purity Water rented from ProAct Service Corporation the equipment that appears on its invoices to Optimira Energy. ProAct was the only vendor in addition to Purolite with whom Purity Water had contracted. As opposed to Purolite, Purity Water is paying off its obligations to ProAct, and the outstanding balance due to ProAct has been reduced by Purity Water to approximately $30,000.00. Ex. A, Carrera Dep. at 68, 80.

Carrera's testimony that Purity Water is unable to pay the sums due and owing to Purolite even were they reduced to a judgment echoes the representations made by his counsel in this case. Purity Water's counsel wrote to Purolite's counsel in July of 2008: "Even if your client can obtain a paper judgment against Purity, it probably would not do any good, and it may hinder or distinguish (sic) my client's ability to continue pursuing the defendants in the currently pending case." Ex. A, Carrera Dep. P-17. And, "my client is cash-strapped . . . Purolite is not the only vendor who is pursuing them." *Id.* Purity Water's Carrera swore on April 15, 2009, that the written representations then made by Purity Water's counsel were true, testifying that "we talked about the fact that we did not have the money to pay Purolite as a result of this project," and, even in response to Purolite offering a settlement with some money down and equal payments thereafter, "what we talked about was the fact that we have very limited resources in regard to being able to pay any money down. And the issue was if -- if the end user . . . had paid their bill, then we would have paid ours . . . including the bill to Purolite." Ex. A, Carrera Dep. at 148, 150-51.

Thus, the exhibits and sworn testimony of Purity Water's COO establish without any qualification the following facts:

- By contract, Purity Water purchased over 43,000 pounds of PD-206 from Purolite for a contract price for the resin and requested delivery services of $230,611, with interest on any unpaid balance after 30 days accruing at the rate of 1 and 1/2 percent per month;

- Purity Water provided the PD-206 to its business partners, who used it in connection with the dewaterization of approximately 2 million gallons of biodiesel fuel at the Dunhill Terminal in Mobile, Alabama;

5

- The PD-206 perforce performed its essential function as is evidenced by the facts that the biodiesel fuel sold for a sum in excess of $5.6 million and Purity Water's business partners transferred 2,200 pounds of the PD-206 from the Dunhill Terminal to Vopak at Houston Texas in order to remove water from approximately 10 railroad cars of biodiesel fuel, a transfer that would never have occurred but for the role that PD-206 played in the reduction in the water content of the biodiesel fuel at Dunhill;

- Purity Water has paid down its debt arising from the Dunhill Terminal project to others, but not to Purolite;

- Purity Water has intentionally misapplied funds provided to it by its Dunhill Terminal business partners as a down payment to purchase Purolite's PD-206 by using them to pay down Purity Water's other Dunhill project debts, but never paid down any of its debt to Purolite with those earmarked funds or any other funds;

- As of July 2008 and as of today, Purity Water was and is unable to pay Purolite, even were the payment reduced to judgment or required by a Court Order.

Under these undisputed facts, Purolite respectfully submits that it is entitled as a matter of law to the relief that it seeks.

## III. Legal Argument

As demonstrated below, Federal Rule of Civil Procedure 65 empowers this Court to enter the injunction Purolite seeks. It is long-standing hornbook law that a plaintiff meets its burden of establishing its entitlement to preliminary injunctive relief on showing (1) a substantial likelihood of success on the merits; (2) the likelihood of suffering irreparable harm absent the injunctive relief; (3) the balance of hardships arising from the injunction if granted; and (4) the

public interest is at least not negatively impacted by the granting of the requested relief. *E.g., Buchanan v. U.S. Postal Service*, 508 F.2d 259, 266 (5th Cir. 1975).

Based upon the admissions of Purity Water's COO and the documents produced by the parties hereto, as is set forth in Section II, Purolite respectfully submits that it has shown beyond per adventure that it has exceeded its burden by establishing the substantial likelihood of its success on the merits, that the balancing of the hardships tips in its favor because Purity Water lacks both the money and will to pay Purolite the principal sum Purity Water owes it, and that the public interest is served by ensuring that Purity Water cannot walk away from its debt to Purolite simply because it is more convenient for Purity Water to pay others and itself with money in its general funds including that was placed there by others for payment to Purolite. Because Purolite is seeking an order escrowing or freezing Purity Water's liquid assets up to the principal sum owed to Purolite by Purity Water, the remaining issue is why the available remedies at law are inadequate, so that Purolite will suffer irreparable harm absent the relief it here seeks.

**A.     The Judiciary Act of 1789 and Decades Old Supreme Court Cases Establish Asset Freeze Escrow Power as a Pretrial Equitable Remedy to Avoid Irreparable Harm Arising From a Defendant's Use, Sale, or Transfer of Assets**

The Judiciary Act of 1789 gave the lower federal courts jurisdiction over "all suits ... in equity." The Supreme Court has consistently interpreted this jurisdictional grant to confer upon the district courts the "authority to administer . . . the principals of the system of judicial remedies which have been devised and was being administered" by the English High Court of Chancery as of 1789. *Atlas Life Ins. Co. v. W.I. Southern, Inc.*, 306 U.S. 563, 568 (1939).

Pursuant to those principles, the Supreme Court long ago recognized that district courts properly exercise equitable jurisdiction where "the remedy in equity could alone furnish relief,

and . . . the ends of justice require the injunction to be issued." *Watson v. Sutherland*, 5 Wall. 74, 79, 18 L. Ed. 580 (1867). Thus, district courts enjoyed the historical federal judicial discretion to preserve the status quo through provisional relief pending the outcome of a case lodged in court. *See generally* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2942.

The historical federal judicial discretion authorized the issuance of preliminary injunctions upon well-supported findings that an adequate remedy at law would potentially be frustrated through the inability of a party to recover a judgment sum absent interim injunctive relief. Thus, more than sixty years ago, the Supreme Court authorized and approved the use of a preliminary injunction to freeze a defendant's assets pending litigation where the ability to recover a judgment absent interim relief could be frustrated. *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) (affirming the use of a preliminary injunction to preserve the status quo by restraining the defendants from transferring assets based upon averments of insolvency and potential dissipation of those assets); *United States v. First National City Bank*, 379 U.S. 378 (1965) (approving a temporary injunction to prevent dissipation of defendant's assets).[4] Thus, on making the requisite showing, the use of Federal Rule of Civil Procedure 65 to freeze assets or escrow monies lying within the issues in the suit was a well recognized tool oft-utilized, with Supreme Court approval, in instances in which the remedy at law was inadequate due to worsening financial condition or dissipation, use, transfer, or sale of a defendant's assets at issue.

---

[4] In a third case, *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212 (1945), the Supreme Court recognized federal courts' authority and power to enter a preliminary injunction restraining defendants from transferring their assets out of the country in the face of a claim involving possible payment or return of assets but declined to do so because the case before the Court sought only injunctive relief and thus the preliminary injunction "deal[t] with property which in no circumstances can be dealt with in any final injunction that may be entered." *Id.* at 220.

B.   **Recent Authorities Manifest the Continuing Validity of Pretrial Escrow/Asset Freeze Orders to Avoid Irreparable Harm from Use, Sale, Transfer or Dissipation of Assets**

By definition, a remedy at law is inadequate if the defendant cannot pay a damage award and such an inadequate remedy establishes irreparable harm. *Blackthorne v. Bellush,* 61 S.W.3d 439, 444 (Tex. App.--San Antonio 2001, no pet.) (affirming prejudgment injunction against asset transfer due to concern that if the defendants were permitted to transfer assets they could become judgment proof); *Bank of the Southwest, NA, Brownsville v. Harlingen Nat'l Bank*, 662 S.W.2d 113, 116 (Tex. App.--Corpus Christi, no writ) (recognizing that remedy at law is inadequate if defendant is incapable of responding in damages but reversing injunction freezing assets because the plaintiff stipulated that the defendant was able to pay the money judgment sought). "[I]nsolvency can be a factor in determining whether there is an adequate remedy at law." *Texas Indus. Gas v. Phoenix Metallurgical Corp.,* 828 S.W.2d 529, 533 (Tex. App.--Houston [1st Dist.], no writ.).  This is necessarily so because, even were the harm capable of being monetized, such as in an action for restitution for breach of contract, a judgment may nonetheless be uncollectible.  Thus, the inadequacy of the remedy at law constituting irreparable harm is that the monetized sum may well be uncollectible.

Illustrative of this principle is *Cattle Finance Co. v Boedery, Inc.*, 795 F. Supp. 362 (D. Kan. 1992).  In *Cattle Finance*, the court issued a preliminary injunction based on irreparable harm due to the defendant's financial inability to pay contract damages.  The plaintiff claimed it had paid for cattle purchased from defendant, while the defendant claimed it still owned the cattle because it had never been paid for the stock, because a non-party had diverted plaintiff's purchase money to the non-party's own use.  The plaintiff sought a preliminary injunction that allowed for the sale of the disputed cattle, with the proceeds to be placed in escrow pending final

judgment. The defendant opposed the requested relief, testifying that it required the use of sale proceeds for ongoing operating expenses and to remain in business, and that it would use the sale proceeds to pay its creditors. The court found irreparable injury in the likely inability of the defendant to pay a money judgment:

> [S]erious doubt has been cast on Boerdery's ability to pay a money judgment of the magnitude that would likely be ordered if the plaintiffs were to prevail on the merits. If Boerdery is allowed to exercise its avowed intention to transfer the cattle proceeds to its creditors out of state, the court's ability to render a meaningful decision on the merits could be seriously impaired. The court must ensure that a plaintiffs' victory in this case would not be an empty one.
>
> Accordingly, the court concludes that the evidence supports the plaintiffs' fears that Boerdery would be unable to pay a monetary judgment, and a finding of irreparable injury is therefore justified.

*Cattle Finance*, 795 F. Supp. at 364 (relying on *Tri-State Generation v. Shoshone River Power, Inc.,* 805 F.2d 351 (10th Cir. 1986); *Central States, Southeast & Southwest Areas Pension Fund v. Merchants Motor Freight, Inc.,* 511 F. Supp. 38 (D. Minn. 1980), *aff'd per curiam sub nom., Central States, Southeast & Southwest Areas Pension Fund v. Jack Cole-Dixie Highway Co.,* 642 F.2d 1122 (8th Cir. 1981); and *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 53 (1st Cir. 1986)).

Thus, even though the defendant was as blameless as the plaintiff, the court was impelled to enjoin the disbursement of the cattle proceeds because to have done otherwise would effectively ensure that the plaintiff, if it prevailed, would receive no money, while the escrow would maintain the proceeds for whichever party prevailed:

> With the injunction, the rights of all parties are assured; in its absence, the rights of plaintiff are put in jeopardy. Thus the balance of harm tips in favor of the plaintiffs.

*Id.*, 795 F. Supp. at 366.

2560460.1

So, too, here, with Purity Water having sworn that it continues to lack the funds to pay Purolite and that it has paid other creditors, but not Purolite, with money that would otherwise be available to at least partially pay Purolite. Should Purolite not prevail on the merits, however unlikely that occurrence appears, the monies will be available to Purity Water.

Other courts have also routinely entered preliminary injunctions requiring escrowing of monies in defendants' accounts, or precluding defendants from removing property or assets from a court's jurisdiction, or requiring that defendants' business revenues be placed in escrow accounts, precisely because any judgment the plaintiff might obtain in its action at law would otherwise be inadequate, so that the harm absent the injunctive relief is irreparable by definition. *See., e.g., Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 250 (2d Cir. 1999) (affirming preliminary injunction barring payment under letter of credit because the defendant's precarious financial condition made it unlikely that the plaintiff could be made whole by a money judgment); *Elliott v. Kiesewetter*, 98 F.3d 47, 54, 57-58 (3d Cir. 1996) (affirming a preliminary injunction freezing defendants' assets holding that "[a] district court is clearly permitted to consider the likelihood that a defendant will be able to pay a judgment in determining whether to enter an asset freeze order"); *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 531-32 (D.N.J. 1999) (defendants' dissipation and transfers of assets and likely uncollectability of judgment if obtained entitled plaintiff to preliminary injunction); *Alvenus Shipping Co., Ltd. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994)[5] (granting injunction because defendant had ceased doing any significant business, had few assets, and was deemed likely to transfer any such award to its parent company such that the likelihood that a money judgment would go unsatisfied established the inadequacy of the remedy

---

[5] Interestingly, just as has Purity Water, in *Alvenus* the defendant asserted that should it be paid by those who owed it money, and then would pay what it owed to the plaintiff. The injunction issued to ensure that plaintiff need not rely upon Delta's "offer."

at law and irreparable harm); *Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 735 (S.D.N.Y. 1993) (enjoining corporation from disposing of assets because of irreparable harm due to corporation's dissipation of assets making judgment uncollectible and failure to show that it has any plan or means to satisfy its obligation).

An asset dollar is fungible with another asset dollar where defendants mix the dollars at issue with other dollars to conduct their affairs. As a result, although courts generally cannot reach and freeze a defendant's assets unrelated to the underlying litigation in order to protect a potential money judgment, such an equitable order sculptured to preserve property or assets in dispute or that might be the subject of a final decree "is always appropriate." *De Beers*, 325 U.S. at 220; *see also In re Fredeman Litigation*, 843 F.2d 821, 825 (5th Cir. 1988); *Alvenus*, 876 F. Supp. at 487 ("As a general rule, irreparable harm is not present when the plaintiff has a claim for money damages. However, an exception to the general rule exists when it is shown that a money judgment will go unsatisfied absent equitable relief.").

Purolite seeks the asset freezing or escrowing in defendant's accounts limited to the contract price that Purity Water agreed to pay for the goods and the delivery thereof Purity Water acknowledged were ordered by and/or for it, and which it received, or, alternatively, the sums that Purity Water acknowledges it received from its Dunhill Terminal business partners but from which Purity Water has failed to pay to Purolite. Purity Water's COO has sworn that Purity Water lacked one year ago and lacks today the funds to satisfy Purolite's principal claim even were there a judgment order. He further swore that he has applied the company's general fund revenues to pay down debt from the Dunhill Terminal project to others, but not to Purolite, even though the $120,300 Purity Water received from its Dunhill Terminal partners included monies they had specifically directed he use as a down payment to Purolite for its resin. Purity Water

12

has thus manifested insufficient financial wherewithal to pay its debt to Purolite, the use of its general fund revenues to pay other company debts, despite the general fund revenues including sums earmarked for Purolite alone, and an unwillingness to address its debt to Purolite. This admitted inability to satisfy a judgment in the principal sum constitutes the irreparable harm necessary to establish Purolite's entitlement to equitable relief, particularly "when the defendant [is] about to become insolvent." *In re Fredeman*, 843 F.2d at 828; *Deckert*, 311 U.S. at 290.

Purity Water's own COO has himself sworn both to the inadequacy of Purolite's remedy at law, and to the irreparable harm Purolite will suffer absent the granting of the relief Purolite seeks. Purolite need present no more.

**C.    *Grupo Mexicano* is Inapposite to Purolite's Entitlement to an Asset Freeze/Escrow Injunction**

Purolite's Complaint contains three Counts: (1) Breach of Contract; (2) Conversion, and (3) Unjust Enrichment. The first two are actions at law. The third is an action at equity. In 1999, the Supreme Court ruled that trial courts lacked the authority to issue Rule 65 injunctions such as that sought by Purolite in connection with actions at law, relegating the trial court's power to issue such injunction in actions at law to Federal Rule of Civil Procedure 64. Reasoning that the Judiciary Act of 1789 did not grant the trial court the power to create remedies previously unknown to equity jurisprudence, the Supreme Court held that district courts lack power under Rule 65 to issue a preliminary injunction in an action at law only, preventing the transferring of assets in which no lien or equitable interest had been claimed, because no such power existed under the Judiciary Act of 1789. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 332 (1999). The Supreme Court left untouched the trial court's power under Rule 65 to issue injunctions such as those sought by Purolite in action at equity.

13

In the aftermath of *Grupo Mexicano*, there was some initial confusion as to the scope of its holding. That confusion, however, has now been removed. As suggested by the Supreme Court, and as now universally construed by the lower courts, the Rule 65 equitable relief Purolite seeks remains vibrant, vital, and appropriate. It is once again clear, as had been the law of *Deckert*, *First Nat. City Bank*, and *De Beers*, that Rule 65 equitable remedies permit the court to preliminarily order the escrowing or freezing of assets of the defendant at issue by virtue of the complaint lodged against it, so long as the plaintiff seeks such relief pursuant to a claim sounding in equity.

Thus, in *Newby v. Enron Corporation*, 188 F. Supp. 2d 684 (S.D. Tex. 2002), a securities class action alleging insider trading was brought against current and former officers and directors of Enron and its subsidiaries, based upon actions at law and actions at equity. The plaintiff filed a motion for a temporary restraining order freezing the proceeds from the sales of the debtor's securities. In considering the plaintiff's application, after an exhaustive analysis of *Grupo Mexicano* and the analysis of *Grupo Mexicano* in *United States ex rel. Rahman v. Oncology Associates, P.C.*, 198 F.3d 489 (4th Cir. 1999), Judge Lee Rosenthal concluded that *Grupo Mexicano* did not bar the court from granting the preliminary and permanent injunction imposing a constructive trust and/or an asset freeze on the proceeds of defendants' alleged insider trading or an accounting of those proceeds.[6]

Reasoning as had the *Rahman* court that a plaintiff raising claims for relief that sound in equity under Rule 65 as well as claims at law is governed by *Deckert*, *First National* and *De*

---

[6] The *Newby* defendants had argued that the plaintiff's claim for money damages was obviously the most significant thrust of its complaint, and that the equitable claims had been inserted solely as a device on which a claim to a prejudgment injunction freezing assets could be based. Even accepting that paradigm, the court issued the requested injunction, noting the absence of any case post-*Grupo* in which a court had denied a preliminary injunction freezing or restricting a defendant's assets on the ground that the plaintiff had sought substantial money damages, with a cognizable equitable remedy as the tail wagging the Rule 65 dog. *Id.* at 701; *see also Rahman,* 198 F.3d at 499 (holding that the fact that substantial money damages are claimed along with equitable relief does not defeat the district court's Rule 65 equitable powers).

*Beers* rather than *Grupo*, so that preliminary injunctive freeze orders are appropriate, Judge Rosenthal opined that a plaintiff need only "show a sufficient nexus between the assets sought to be frozen and the equitable relief plaintiffs request" in order to establish that "the temporary restraining order is a reasonable measure to preserve the status quo in aid of the ultimate equitable relief claimed." *Newby*, 188 F. Supp. 2d at 696-97.[7]

In *Animale Group, Inc. v. Sunny's Perfume Inc.*, 256 Fed. Appx. 707, 2007 WL 4259200 (5th Cir. 2007), the Fifth Circuit applied these principles to affirm the entry of a Rule 65 general fund and asset freeze preliminary injunction. The plaintiffs had filed a six count complaint for violations of the Lanham Act and various state torts, averring defendants' sale of counterfeit perfume bearing plaintiffs' trademark. In connection with the action, plaintiffs sought a Rule 65 order freezing defendants' assets. The trial court granted the motion, and enjoined the defendants from transferring approximately $600,000 in real property and cash. The court predicated its authority upon the fact that plaintiffs' suit was not limited to actions at law but also averred equitable claims, and that a freeze was necessary to prevent defendant's dissipation of the assets, including corporate general funds.

The Fifth Circuit affirmed the entry of the freeze order, distinguishing *Grupo Mexicano* and relying upon *Deckert* and *First National City*. The court held that *Grupo Mexicano* is limited to actions solely at law. *Id.*, 256 Fed. Appx. at 709.

Plaintiff has pled a claim in equity. The third count of Purolite's Complaint avers the equitable cause of action of Unjust Enrichment. That count recites the purchase by Purity Water

---

[7] The *Newby* court denied the freeze injunction because the plaintiff had not presented particular proof against each defendant and thus was unable to demonstrate that the remaining assets or profits would be unavailable to satisfy plaintiff's equitable claims, or a basis for concluding that defendant was then dissipating or concealing assets or profits. In stark contrast, the proofs from Purity Water's own COO that Purity Water's past and current finances are insufficient to satisfy Purolite's restitution claim and that Purity Water has dissipated its monies, even paying to others funds that it has received that were earmarked for Purolite, manifest the requisite demonstration of more than a substantial threat of irreparable injury.

15

of the 43,000 pounds of PD-206, with the cost of the resin alone at $221,919 absent freight and delivery charges, and the sums billed and total obligation of Purity Water to Purolite comprising sum of $230,611 on including freight charges, and excluding interest accruing at the rate of 1 1/2% per month. Ex. B at ¶¶ 38-39. The count specifies the unjust enrichment as Purity Water's utilization of Purolite's PD-206 without paying a penny to Purolite, with the measure of the enrichment being the market value of the resin and the associated costs for which Purity Water contracted. Ex. B at ¶¶ 40-41.

Because this case is before the Court by virtue of diversity jurisdiction, the nature of the action is governed by the law of the State of Texas. Under Texas law a claim of unjust enrichment constitutes an action at equity. *E.g.*, *Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265, 270 (Tex. App.--San Antonio 2004, pet. denied); *see also Edwards v. Mid-Continent Office Distrib., L.P.*, 252 S.W.3d 833, 837 (Tex. App.--Dallas 2008, pet. denied).

Thus, having pled a claim for relief sounding in equity, the relief afforded under Rule 65 empowers the Court to enter the asset freeze or escrow order that Purolite seeks.

## IV. Conclusion

For the reasons set forth above, Purolite respectfully submits that the sworn testimony of Wesley Carrera, the Purity Water's COO, manifests beyond per adventure that Plaintiff has met its burden of establishing its entitlement to the asset freeze/injunction order that it seeks under Federal Rule of Civil Procedure 65. Purity Water has manifested an inability as well as an unwillingness to pay the $231,000 principal sum (without interest) owed to Purolite; moreover, Purity Water has sworn that it cannot do so, even though it received more than $120,000 from its Dunhill Terminal PD-206. Yet, not one penny was forwarded by Purity Water to Purolite.

Absent relief, it is readily apparent that Purolite will have nothing other than a paper judgment.

Respectfully submitted,

Bruce L. Thall, Esquire
SPECTOR GADON & ROSEN, PC
1635 Market Street, 7th Floor
Philadelphia, PA  19103
215-241-8888
215-241-8844 (fax)


COX SMITH MATTHEWS INCORPORATED
112 E. Pecan Street, Suite 1800
San Antonio, TX 78205
210-554-5294/210-226-8395 FAX

 _/s/ Leslie Sara Hyman_____
Leslie Sara Hyman
State Bar No. 00798274
lshyman@coxsmith.com
Travis C. Headley
State Bar No. 24032283
tcheadley@coxsmith.com

*Attorneys for Plaintiff*

**Certificate of Service**

I certify that on the ___ day of May 2009, I served Plaintiff's Motion for an Escrow Order Under Federal Rules of Civil Procedure 65 via the Court's CM/ECF system, which will serve copies to the following counsel of record:

R. Douglas Campbell
Lawrence L. Garcia & Associates, P.C.
257 E. Hildebrand
San Antonio, Texas  78205
dcampbell@sajustice.com

Harry V. Satterwhite
Deena Renee Tyler
Satterwhite & Erwin, L.L.C.
1203 Dauphin Street
P.O. Box 1308
Mobile, AL 36633-1308
Harry@satterwhite-erwin.com
Deena@satterwhite-erwin.com

                                       ___/s/ Leslie Sara Hyman_____
                                       Leslie Sara Hyman

2560460.1