IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BRO-TECH CORPORATION d/b/a THE PUROLITE COMPANY | § § § | |
| | § | |
| V. | § | CIVIL NO. SA-08-CV-0594-XR |
| | § | |
| | § | |
| PURITY WATER COMPANY OF SAN ANTONIO, INC. | § § § | |

**ORDER**

On this date, the Court considered Plaintiff's Motion to Exclude the Expert Report and

Expert Testimony of Richard W. Heiden, Ph.D. (docket no. 49), and the Response (docket no. 53)

and Reply (docket no. 59) thereto. After careful consideration, the Court will grant the motion.

**I. Background**

On July 22, 2008, Bro-Tech d/b/a The Purolite Company ("Purolite") filed this action against

Purity Water Company ("Purity"), asserting claims for breach of contract, conversion, and unjust

enrichment related to Purity's failure to pay Purolite for approximately 43,420 pounds of PD-206.

The plaintiff, Purolite, manufactures polymers and resins, such as PD-206, used to filter and purify

substances by removing contaminants. Purity is a purification company. Purity contracted with

third parties, Vertex Energy, Inc. and others, to purify approximately two million gallons of

biodiesel in Mobile County, Alabama (the Dunhill Terminal Project), and subcontracted with

Purolite to provide PD-206 to purify the fuel. Purity purchased 43,420 pounds of PD-206, for which

it has not paid Purolite.

After this Court denied Purity's motion to dismiss or, in the alternative, to stay, Purity filed

an Answer and Counterclaim on October 6, 2008. Purity asserted a counterclaim for breach of contract, alleging that: (1) Purity subcontracted with Purolite to provide resin that would reduce the water content in the biodiesel product, rendering the product marketable as fuel; (2) Purolite produced a defective resin, which was used in the Biodiesel Dunhill Terminal Project, and which failed to perform its essential purpose pursuant to the contract between Purity and Purolite; (3) as a direct and proximate result of the failure, Purity has not been paid by Vertex and others; (4) therefore, Purolite breached the contract and Purity sustained damages in the amount of $351,193.89 as a result.

On March 13, 2009, the deadline for Purity to file its expert designation and report under the scheduling order, Purity moved for an extension of time to do so based on its asserted difficulty in finding an available expert. The motion was opposed. The Court granted the motion on April 2, 2009, extending the deadline to April 26, 2009. On April 26, Purity designated Richard Heiden and served his expert report on Purolite.

Heiden's report, dated April 26, 2009, begins

> Of particular interest are the laboratory data and memo's [*sic*] regarding the implementation of biodiesel drying/purification technology used in this operation, and the performance of this technology which is the subject of this suit. This data set provides insufficient information to draw specific conclusions regarding the cause of failure of the resins. It should be noted that at the time of this review depositions of the principals are incomplete, and that the information gaps are likely to be closed by subsequent interviews, information and laboratory testing.

He continues, however, with his observation that "[t]hree red flags emerged during the review that have bearing on the performance of the Purolite PD 206 resins for moisture removal and the overall biodiesel production operation." These three "red flags" are then listed as "1) Levels of calcium and magnesium in the 'purified' biodiesel end product that clearly limit the producer's ability to meet

2

either European or American ASTM specifications, regardless of moisture restrictions. 2) High levels of free glycerin in excess of either American or European fuel specifications and on at least one occasion very near the solubility limit for glycerin in biodiesel, compete with moisture for resin capacity and block the effectiveness of the resins for moisture removal. 3) High humidity during the resin loading phase outdoors, and a possibility that the resin, as received, contained higher levels than specified for the moisture removal process."

Heiden explains that biodiesel must be purified to meet ASTM and EU specifications for fuel quality, and one purification process that has become more prevalent is a "dry washing approach," such as the use of ion exchange resins. However, he continues, "the ion exchange resin beds have finite capacities and differing affinities for the different types of impurities" and, as a practical consequence, "the [different] types of impurities compete with one another for sites on the resin bed, which consists of a column (or tank) of small resin beads." "The biodiesel flows over these beads and by contact the beads take away some of the target impurities, and with sufficient time and capacity, most of them." He continues, "Assumptions about the life of the resin beds in a given cycle are only reliable when all of the impurities in the biodiesel stream are controlled, strictly accounted for before implementation, the purification system is properly designed, and the resins are provided in a condition, as specified."

Heiden states that the "primary intended use of this ion exchange resin technology in the present case is to remove residual moisture to less than 500 ppm, a fuel specification that must be met for import into the EU community of nations." He asserts that initial test of the resin in July-August 2007 showed promising moisture removal results initially, followed by disappointing results. He continues, "A review of the data, and memos provided is summarized below. The provided

information calls into question whether the underlying tenets of the bed life assumptions [*sic*]: namely that the biodiesel impurity concentrations were controlled and strictly accounted before implementation; that the implemented design was appropriate; and that the resins were provided, as specified.  It is anticipated that additional information regarding the biodiesel firm's specific biodiesel process, use of chemicals, problems, etc. could have a bearing on the performance of these resins in the moisture removal process and that this information will be provided through the deposition process.  A thorough testing of the resins and resin performance is necessary to ascertain the effectiveness of the recirculation design and the condition of the resins."

In the "Observations" section of his report, Heiden's section of "Moisture Removal by the Ion Exchange Resins" notes that "the implementation of the ion exchange resins for moisture removal was during the period of July and August of 2007," a time of high humidity in Alabama. He states that "[e]xposure of dry resin to air, for example during loading of the resin beds, could lessen the resin's effectiveness at removing moisture from biodiesel" and "[i]f the resin arrived less than completely dry, the added moisture from the thick, tropical air would have accentuated a loss in moisture removal capacity."  Heiden notes that substantial moisture reduction "with final product well below the 550 ppm specification" was achieved on July 15, 2007.  However, on July 18 samples, there was only "small drop of less than 50 ppm" after passage through a resin bed" and there was discussion July 21 about "concerns that the 'bed loaded prematurely on glycerin.'"

Also in his "Observations" section, Heiden includes a section titled "Excessive Levels of Calcium and Magnesium in Finished Product."  He notes that in July and August 2007, the biodiesel producers (presumably Purity) went to great efforts to ameliorate the calcium and magnesium content of the finished biodiesel, and that such excessive levels are abnormal in finished biodiesel

because "substances that contain them are rarely used in the biodiesel manufacturing process." Heiden observes that "[t]he 'leakage' of calcium/magnesium through the purifying ion exchange resin indicates external contamination of the biodiesel process, and/or resin contamination." He states that one possible source of such external contamination is contact with municipal water prior to the moisture removal process, as is "[u]nmentioned chemicals used in the biodiesel manufacturing processes." He further states that "[a]nother candidate source is previously used, contaminated resins provided by the resin manufacturer." He notes that the documentation provided contained "[n]o discussion of the source of calcium." He states that "[v]irgin (previously unused) resins were supposedly provided for this project by the resin vendor" and that "[c]alcium saturated resins are likely to have different (and reduced) moisture retention characteristics compared to virgin resins." He then states that "[r]esin analysis and experimentation with the resins can help provide more definitive conclusions." Heiden further notes that, if the biodiesel contained calcium before the ion exchange process, this could compromise the effectiveness of the resin. He then notes that calcium levels were high after passing through the resin, and "[t]his excessive leakage from the moisture removal ion exchange resins indicates that the capacity of the resin for calcium was exceeded." Further, "such high levels of calcium would cause the release of acidity that would be indicated in high acid number results," but "[a]cid number results appear normal, so the capacity of the resin is questionable." Heiden then states that "[s]ources of calcium and magnesium in the finished biodiesel include contact of the biodiesel with ground or municipal water somewhere upstream of the purification process, or leakage from an incorrect resin form, or a resin that was in the incorrect form when provided."

In his third "Observation" section, Heiden discusses "High Level of Free Glycerin." He

states that "[f]ree glycerin is normally taken out of the biodiesel with the ion exchange resin process" but this process "achieved minimal success"as lab results show excess levels of free glycerin "on at least one occasion." He states that "[t]he high levels reported are close to the solubility limit of glycerin in biodiesel" and "[t]hat would mean there are liquid phases or blobs of liquid glycerin on the resins or in the system that slowly release the glycerin to the finished biodiesel product." Heiden notes that "[g]lycerin competes with moisture for capacity on the resin" and such concerns were expressed in a July 21 memo.

Finally, in the fourth "Observation" section entitled "Design of the Purification System," Heiden notes that closed-loop designs are uncommon for biodiesel purification and that "a flow of '200gpm around the loop'" is mentioned in a July 23, 2007 memo. He then states that "[b]ecause of the type of substances, namely residual moisture, free glycerin and methanol, that are targeted for removal, this process design is likely to be more difficult to control." He concludes, "We are unable to definitively state the impact of the loop concept on water removal without some experimentation."

On May 12, 2009, Purolite filed the instant motion to exclude Heiden's report and expert testimony (docket no. 49), arguing that he does not opine that Purolite's resin was defective, as alleged in the counterclaim, and that he cannot ascribe a cause of the impurities, including water, in the biodesel. Purolite argues that the testimony is therefore inadmissible under Federal Rules of Evidence 702 ("Testimony by Experts"), 401 (relevance standard), 402 (irrelevant evidence inadmissible), and 403 (exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time).

## II. Arguments

Purolite contends that Heiden appears to be under the mistaken assumption that the biodiesel

6

did not sell due to water being present in the treated fuel in amounts in excess of 550 ppm, in excess of EU standards. However, Purolite points out that the biodiesel did sell for over $5.6 million. Purolite further asserts that Heiden's report "fails to ascribe a cause or conclusion as to which if any of the ascribed theoretical bases that could cause resin failure had in fact occurred, or whether the resin itself was defective." Among the possible causes for the contamination of the biodiesel, Heiden includes the possibility that exposure of the dry resin to the humid Alabama air could have reduced the moisture removal capacity of the resin and the possibility that the resin was previously used and contaminated. Purolite asserts, however, that the sole documents addressing the resin moisture content disclose that all of the PD-206 was certified as having a moisture level of no more than 3%, and further contends that there is no suggestion or evidence that Purolite provided pre-used or contaminated resin, and the records show the resin was certified as pure. Thus, Purolite criticizes Heiden's testimony because he has no data from which to conclude that any of his theoretical possibilities actually occurred, and he merely notes a range of potential causes. Purolite contends that such hypotheticals are not helpful to the trier of fact.

Purity responds that Heiden provided his report while discovery was ongoing and stated in his report that "the information gaps are likely to be closed by subsequent interviews, information and laboratory testing." Purity further notes that it propounded a Second Request for Production of Documents and Things to Purolite, and that Purolite had not responded.[1] Purity complains that

---

[1] On May 26, 2009, Purity moved to extend the discovery deadline until June 2 such that Purolite would have to respond to the Second Request for Production of Documents and Things. Purity served the Request on Purolite's local counsel on May 2, 2009 and on Purolite's Philadelphia counsel on May 4, and the discovery cut-off date was May 26. Under Rule 34, Purolite had thirty days to respond, making the response due after the discovery cut-off date. Under this District's local rule CV-16(d), "[w]ritten discovery is not timely unless the response to that discovery would be due before the discovery deadline" and "[t]he responding party has no obligation to respond and object

Purolite "is trying to exclude Heiden's report and Heiden's testimony solely upon an isolated report that reviewed the analysis from the biodiesel and discussed factors related to the results." Purity argues that Heiden's opinions meet the requirements for admissibility in that he is qualified and applied a clearly articulated and reliable methodology, and that he notes that the resin's moisture-removal capacity could be affected by, among other factors, levels of moisture in the resin and contamination by previous use. Purity contends that the fact that the biodiesel sold is a "red herring" because the parties were not happy with the way the resin performed and it could not be sold on the intended market. Rather, it had to be "sold on a market for a lesser price." Purity argues that, at bottom, Purolite's arguments go only to the weight and not the admissibility of the testimony.

Purolite filed a reply, arguing that Purity's response shows its failure to diligently use the discovery process during the court-mandated discovery period or additional time granted by the Court and attempts to disguise the fact that the report is not yet complete by bolstering its expert on irrelevant issues such as his qualifications. Purolite notes that one reason this Court granted the extension to file the expert report was the importance of expert testimony in establishing that the resin was defective and failed to perform, but asserts that the Heiden is unable to conclude that there was a defect or that the resin failed to perform. Purolite states that "Purity Water apparently did not provide the additional data that Dr. Heiden claimed he required in order to be able to apparently 'supplement' his report, even though that data, in large measure, was in the possession of Purity

---

to written discovery if the response and objection would not be due until after the discovery deadline." Despite the fact that it was not required to respond, Purolite served its responses on May 28, 2009. One of the "things" sought by Purity in the Request for Production was resin samples. Purolite informed the Court that it had responded, and Purity's motion was dismissed as moot by text order. The Court notes that the Request for Production was not served upon Purolite until after Purity served Heiden's report.

Water." Purolite states that Purity could have provided Heiden with necessary data, including (a) data on the biodiesel impurity concentrations and information regarding measures taken to control and strictly account for them prior to dewaterization, (b) Purolite's documentation "manifesting that a recycle system was taboo and that a flow through, series vessel purification system was required," (c) Purolite certifications that the resin provided had a water content of 3% or less, (d) additional information regarding the "specific biodiesel processes, use of chemicals, problems, etc." noted by Heiden as affecting the analysis, (e) information on the design of the purification system and the impurities in the biodiesel stream, and (f) lab certifications for the resin in the lab notebooks provided to Purity during discovery. Purolite argues that no additional time should be given for testing of the resin given Purity's failure to exercise diligence. Purolite further contends that "[e]ach and every musing or hypothesis of Dr. Heiden is perforce based upon insufficient facts or data" and does not address any fact in issue and is thus in clear violation of Rule 702. Purolite notes that Purity "appears to argue that Dr. Heiden's report is preliminary, and not a final report," but Purity had not expressly indicated that the report is preliminary, never attempted to update the report, and the time for serving a "final" expert report has long passed.

Purolite contends that "all that Purity Water has left is its assertion that were Purolite to produce documents and things, the documents and things might permit Dr. Heiden to reach a conclusion." Purolite states that the Request for Production requested resin samples and Purolite's lab notebooks, and that the lab notebooks have been produced while, apparently, the samples were not retained. Purolite argues that "testing of the resin samples after all this time would not advance the resolution of this case without proof that belated retesting offers scientifically relevant information" and asserts that without the information that Heiden requires regarding the original

biodiesel impurity concentrations; the steps undertaken to ensure that the biodiesel and its impurities were controlled and accounted for prior to dewaterization; the design of the dewaterization system; the chemicals used; and undisclosed 'other problems,'" Heiden still would not be able to render an admissible opinion.

### III. Analysis

Rule 26 governs the disclosure of expert testimony. It provides:

(2) Disclosure of Expert Testimony.

(A) In General. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(B) Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;
(ii) the data or other information considered by the witness in forming them;
(iii) any exhibits that will be used to summarize or support them;
(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

(C) Time to Disclose Expert Testimony. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

(i) at least 90 days before the date set for trial or for the case to be ready for trial; or
(ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B), within 30 days after the other party's disclosure.

(D) Supplementing the Disclosure. The parties must supplement these disclosures when required under Rule 26(e).

FED. R. CIV. P. 26(a)(2)(B). Further, under Rule 26(b)(4)(A), "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial. If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided."

The Advisory Committee notes state that Rule 26(a)(2) "imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." The notes further state that

> Paragraph (2)(B) requires that persons retained or specially employed to provide expert testimony, or whose duties as an employee of the party regularly involve the giving of expert testimony, must prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor. The information disclosed under the former rule in answering interrogatories about the "substance" of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness. Revised Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed.

Rule 26 contains two requirements – a party must designate the expert and it must provide a report. There is no issue here regarding whether Purity timely designated Heiden as an expert. There is an issue, however, whether Purity has provided a report in conformance with Rule 26(a)(2)(B). Rule 26(a)(2)(B) requires the party to provide a "complete statement of all opinions the witness will express and the basis and reasons for them" and "the data or other information considered by the witness in forming the opinions." "One of the purposes of the Rule 26 disclosure and report is to compel the proponent of the expert to be prepared for the remainder of the trial of the case by requiring the expert to finalize his opinions at least ninety days prior to trial." *Current v. Atochem*

11

*N. Am., Inc.*, Civ. A. No. W-00-CA-332, 2001 WL 36101282 (W.D. Tex. Sept. 18, 2001) (citing Federal Judicial Center Reference Manual on Scientific Evidence 49-50 (2000)).  Though Rule 26 also provides for supplementation, "[t]his does not mean, however, that the expert can continue to opine on additional matters following the Rule 26(a)(2) deadline." *Current*, 2001 WL 36101282 at *2.  Supplementation is not intended to provide an extension of the expert report production deadline.  *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998).  "Thus, if a party's expert witness Rule 26(a)(2) report is not 'a complete statement of all opinions to be expressed' that party has violated Rule 26." *Current*, 2001 WL 36101282 at *2.

It is clear from the report itself that it is merely a preliminary report, and that Heiden contemplated that he would have additional information and conduct testing before reaching a conclusion regarding the "performance" of the resin.  The report contains preliminary "observations" and "red flags" but makes no conclusions regarding whether the resin was actually defective or that defective resin was more likely than not the cause of excessive moisture or other contamination of the biodiesel.  Rather, Heidin opines only that the resin may have arrived less than completely dry and/or been exposed to excessive humidity during loading, that the resin may have been previously used and contaminated, and that high levels of free glycerin would mean that "there are liquid phases or blobs of liquid glycerin on the resins or in the system."  Other than his glycerin hypothesis, he appears to have no factual data to support the conclusions, though this is difficult to determine since, as pointed out by Purolite, the report does not include the requisite list of the data or other information Heiden considered other than a general characterization of "laboratory data and memos" and a few references to specific documents.

Purity's arguments against striking the report are unavailing.  First, Purity argues that "[a]ny

12

alleged issue Purolite has with Heiden's opinion can be fully explored on cross-examination or through the introduction of competing evidence" and "Purolite is free to argue at trial its alleged issues." These arguments ignore the fundamental purpose of the expert report. The requirement that the party provide a complete report of the opinions that the expert will offer at trial is to allow the opposing party to effectively cross-examine the expert, designate a rebuttal expert, and prepare for trial. This purpose is defeated when the expert has not reached any conclusions and has not yet conducted the requisite tests. Purity appears to believe it may submit a preliminary report because discovery is ongoing. However, under this Court's standard scheduling order, expert reports are due before the discovery cut-off date, *i.e.*, while discovery is ongoing, so that the parties have time to conduct expert depositions. The fact that discovery is ongoing does not generally permit a party to provide a preliminary report, especially where, as here, the party has not demonstrated that it did not possess and could not have obtained the necessary information and provided it to the expert in a timely manner. Discovery is now closed, and Purity has not even provided a "supplemental" report in which Heiden reaches any conclusions or has performed any testing.

Based on the foregoing, the Court concludes that Heiden's report violates Rule 26. Purolite has not moved to strike Heiden's report and testimony under Rule 37, however. Rather, Purolite attacks the substance of the report under Rule of Evidence 702 and the requirement that expert testimony be relevant and assist the trier of fact. The Court thus turns to that issue.

Heiden's report hypothesizes that various causes could have resulted in the fact that the biodiesel was not adequately purified. He does not opine that any particular cause was more likely and expressly states that more information and testing will be necessary to draw such conclusions. Purity argues that the report is sufficient and contends that the fact that several possible causes might

remain "uneliminated" goes to the accuracy of the conclusion and not the soundness of the methodology, citing *Asad v. Continental Airlines, Inc.*, 314 F. Supp. 2d 726, 740 (N.D. Ohio 2004). While this may be true in some instances, this rule contemplates that the expert has at least conducted the requisite testing and analysis and reached some conclusions regarding causation.

Expert testimony is admissible only if it is both relevant and reliable. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). Thus, to be admissible under *Daubert*, an expert's testimony must not only be reliable, but also must be relevant to the issue of causation. *Id.* at 245. The Fifth Circuit has held that expert testimony that fails to show that a potential cause is more or less probable is irrelevant, as is "perfectly equivocal" testimony. *See Burleson v. TDCJ*, 393 F.3d 577, 587 (5thCir. 2004) (holding that since the expert could not show that the welding electrodes were more or less probable to be the cause of plaintiff's cancers, the testimony was irrelevant under the Federal Rules of Evidence); *Pipitone*, 288 F.3d at 245 ("Dr. Millet's testimony on causation is not helpful to the fact-finder because of his inability to conclude that it was more likely than not that the Synvisc caused the infection in Pipitone's knee. A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."). Accordingly, Heiden's testimony, as set forth in his report, fails to show that, more likely than not, the resin was defective and failed to perform its essential purpose. Rather, he admits that other potential causes exist and their effect cannot be determined absent additional information and testing. Further, because the report itself demonstrates that it is based on insufficient facts or data, any "conclusions" Heiden does draw regarding potential problems with the resin (*i.e.*, that it had a higher moisture content or was reused and contaminated), are inherently speculative and unreliable and fail to satisfy Rule 702.

Though the Court concludes that Heiden's report and "opinions" could be struck under the Rules of Evidence, the true complaint is that Heiden's report is incomplete, and thus the Court feels constrained to also consider whether striking the report is appropriate under Rule 37 as a violation of Rule 26 and the Court's scheduling order. As noted previously, Purity Water has already sought and received an extension of time to file its expert report because Purity asserted that it had difficulty locating an expert and because the expert, when found, needed additional time to prepare his report because discovery was ongoing. As noted by Purolite, the Court granted Purity even more time than it requested to file the report.

Turning to the four factors the Court previously analyzed, (1) the explanation for the failure to timely meet the deadline; (2) the importance of the evidence and testimony; (3) potential prejudice in allowing the late designation; and (4) the availability of a continuance to cure such prejudice, the Court finds that they now justify striking the report. Purity's only apparent explanation for the incomplete report is that discovery is ongoing. However, the Court has already noted that this is not an adequate excuse, and agrees with Purolite that Purity has not diligently pursued discovery such that it would have the necessary materials and information available for its expert to prepare a timely report. The Court again concludes that Heiden's expert testimony will be highly important to Purity's counterclaim. However, Purity has already been given an extension of time in which to secure an adequate expert report, and the importance of this testimony should have spurred Purity to obtain a complete report by the deadline. Purolite will be prejudiced by allowing Purity to file a new report because discovery has now closed. The Court would have to reopen discovery to allow Purolite to depose Heiden and would have to allow Purolite time to obtain and prepare its own expert, potentially interfering with the September trial date and delaying resolution of Purolite's

pending motion for summary judgment. Though a continuance could cure the prejudice, the Court finds that a continuance should not be utilized since Purity has already obtained a significant extension of time to file its expert report. In sum, the Court finds that the four-factor test weighs in favor of granting the motion to strike.

### Conclusion

Purolite's Motion to Exclude the Expert Report and Expert Testimony of Richard W. Heiden, Ph.D. (docket no. 49) is GRANTED.

It is so ORDERED.

SIGNED this 19th day of June, 2009.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE