IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BRO-TECH CORPORATION d/b/a THE PUROLITE COMPANY | § § | |
| Plaintiff | § § | |
| V. | § | CIVIL NO. SA-08-CV-0594-XR |
| | § § | |
| PURITY WATER COMPANY OF SAN ANTONIO, INC. | § § | |
| Defendant | § | |

**ORDER**

On this date, the Court considered Plaintiff Bro-Tech d/b/a The Purolite Company's Motion for Summary Judgment on Contract Claim (docket no. 81), and the Response and Reply thereto. After careful consideration, the Court will grant the motion in part.

**I. Background**

The plaintiff, Bro-Tech d/b/a The Purolite Company ("Purolite"), manufactures polymers and resins, such as PD-206, used to filter and purify substances by removing contaminants. Defendant Purity Water is a purification company. In July 2007, Purity Water contracted or otherwise engaged with several third parties – Optimira Energy, Inc., Edgewater Systems, Greenfield Products (Canada), Momentum Biofuels, Inc., VQuip, Inc., Vertex Energy, Inc., Vertex Energy, LP, Vertex Green Energy, LP, and Renascent Energy, LLC (referred to as "the Dunhill third parties") – to purify approximately two million gallons of biodiesel in Mobile County, Alabama (referred to as "the Dunhill Terminal Project"), and subcontracted with Purolite to provide PD-206 to purify the biodiesel. Purity Water claims that the PD-206 resin was defective, and as a result, it

1

has not been paid in full by the Dunhill third parties. Purity Water has not paid Purolite for the PD-206 resin.

On January 24, 2008, Purolite filed suit against Purity Water and VQuip in federal district court in Pennsylvania, asserting breach of contract and unjust enrichment claims related to Purity Water's failure to pay Purolite for the PD-206. The complaint alleged that "[o]n the order of Purity Water, and with the knowledge, agreement of and even negotiated by VQuip, Purolite sold 15,180 pounds of PD-206 on July 11, 2007, 14,820 pounds of PD-206 on July 17, 2007, and 13,420 pounds of PD-206 on July 25, 2007 to Purity Water and VQuip." Purolite stated that it agreed to discount the price on the second order "at the request of VQuip and Purity Water."

Shortly thereafter, on February 22, 2008, Purity Water filed suit against a number of Dunhill third parties in state court in Alabama, asserting claims related to the Dunhill Terminal Project.

On March 31, 2008, Purolite dismissed its claims against VQuip in the Pennsylvania lawsuit. On April 16, 2008, the Pennsylvania district court dismissed Purolite's action against Purity Water without prejudice for improper venue.

Purolite then filed this action against Purity Water on July 22, 2008, asserting claims for breach of contract, conversion, and unjust enrichment. Purolite alleges that Purity Water purchased 43,420 pounds of PD-206, for which it has not paid Purolite, and seeks damages based on Purity Water's failure to pay.

The next day, on July 23, 2008, Purity Water amended its complaint in the Alabama action to add Purolite as a defendant, alleging breach of contract with respect to the performance of the PD-206. On August 14, 2008 Purity Water moved to dismiss this action, arguing that venue was not proper here or, in the alternative, that this action should be stayed pending resolution of the Alabama

state action.

In its motion and supporting memorandum, Purity Water stated that Alabama River Company owned approximately two million gallons of biodiesel in tanks at the Dunhill Terminal that needed purification. Purity Water stated that on July 10, 2007, it was contracted to remove the water and certain elements from the raw biodiesel, and the contract was for goods and services. Purity Water further stated that "[i]n order to remove the water and certain elements, Purity Water used a process that involved other subcontractors" and that "Purity Water accepted Purolite as a subcontractor," who was to produce a resin used in the production process. Purity Water stated that it received partial payment, but "some of the [Dunhill third parties] claimed Purolite's resin failed to produce the results needed to successfully remove the water and other elements from the biodiesel product." Purity Water stated that "[e]ventually, [it] performed all of the obligations and conditions it had under its contract regarding the removal of water and certain elements" from the biodiesel, but the Dunhill third parties breached their contract with Purity Water and failed to submit payment. Further, Purity Water noted that, in the Pennsylvania suit, Purity Water had alleged that VQuip placed the second/final resin order, and that it did not dispute this assertion.

On September 22, 2008, this Court denied Purity Water's motion to dismiss or stay. On October 6, Purity Water filed its Answer and Counterclaim, in which it alleged a claim for breach of contract against Purolite. On November 17, Purity Water filed a motion to transfer venue, which this Court denied on January 9, 2009. On May 11, Purolite moved for summary judgment on Purity Water's counterclaim, and on May 12, moved to exclude Purity Water's expert witness. On June 19, this Court granted Purolite's motion to exclude the testimony of Purity Water's expert witness. Purity Water's expert, Richard Heiden, was to testify that the PD-206 was defective. On July 14,

2009, the Court granted Purolite's motion for summary judgment on Purity Water's counterclaim. Purolite now moves for summary judgment on its breach-of-contract claim.

## II. Summary Judgment Standard

A movant seeking summary judgment must inform the court of the basis of his motion and point out those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R.CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets his burden, the burden then shifts to the non-movant to set forth specific facts and competent summary judgment evidence to raise a genuine issue of material fact on each essential element of any claim on which he bears the burden of proof at trial. The non-moving party may not rest on mere allegations or denials in its pleadings, but must produce affirmative evidence, and specific facts showing that there is a genuine issue for trial.

## III. Analysis

### A. Plaintiff's Allegations

Purolite alleges that PD-206 is "a Purolite designed and manufactured resin used for the polishing or final treatment of biodiesel fuel" that removes glycerin, water, soaps and catalysts from biodiesel fuel, thereby rendering it fit for its intended use and appropriate for sale by meeting all European or ASTM standards. Compl. ¶ 12. Purolite alleges that Vertex agreed to broker 1.8 million gallons of biodiesel fuel that did not meet ASTM or European standards, and contacted Purity Water "to design and supervise the construction of the tanks and systems to remove the water impurity from the biodiesel fuel and thereby permit its sale in the United States or Europe, having

met both ASTM and European standards." Compl. ¶ 15. Purolite alleges that Purity Water "determined to utilize PD-206 resin for the removal of the water in the 1.8 million gallons of biodiesel fuel." Compl. ¶ 16. Purolite alleges that its role was one of subcontractor, restricted to selling the resin to Purity Water, and Purity Water "contracted with Vertex to provide [the resin to] Vertex and others, and at a cost <u>above</u> that charged to Purity Water by Purolite, together with the design, equipment and technology for the removal of the excess water from the 1.8 million gallons of biodiesel fuel." Compl. ¶ 17.

Plaintiff Purolite alleges that it had a longstanding business relationship with Defendant Purity and, as a result, the payment terms imposed on Purity by Purolite for sales were "no money down with the balance due and owing to be paid within 30 days from shipment of product." Compl. ¶¶ 9, 10. Purolite alleges that, until the events made the basis of this lawsuit, Purity had always timely paid amounts due. Plaintiff alleges that "[o]n learning from Purity Water that the time constraints for the sale of the 1.8 million gallons of biodiesel fuel were very short, Purolite agreed to provide the PD-206 to Purity Water for its Vertex contracts without modification of its billing arrangements with Purity Water, on obtaining Purity Water's assurances that Purolite would be paid in full, just as Purity Water had paid in full in past business dealings between them." Compl. ¶ 18.

Plaintiff Purolite alleges that on the oral and written orders of Purity Water, Purolite sold 15,180 pounds of PD-206 on July 11, 2007, 14,820 pounds of PD-206 on July 17, 2007, and 13,420 pounds of PD-206 on July 25, 2007 to Purity Water. Compl. ¶ 19. Further, Purolite alleges that, at Purity Water's request, it agreed to discount the price of the PD-206 ordered and shipped on July 25, 2007 so that Purolite's charge per pound was $4.80, as opposed to $5.25, which was the amount charged on the prior orders. *Id.* Purolite alleges that the 43,420 pounds of PD-206 were purchased

for a total of $221,916, with Purity Water contracting to pay for freight and delivery charges, FOB Philadelphia, PA.  Compl. ¶ 20.  Including freight charges, the total amount billed was $230,611. *Id.*  In addition, each invoice contains a provision charging Purity Water with interest on any unpaid balance afer 30 days.  *Id.*  Plaintiff Purolite alleges that the resin was delivered as contracted, but Purity has refused to pay.

**B. Defendant's Allegations**

In its Answer and Counterclaim, Purity Water denied the allegations in Purolite's Complaint and asserted the affirmative defenses of (1) improper venue[1]; (2) estoppel; (3) breach of the duty of good faith and fair dealing; (4) "reliance, privilege, justification, and excuse"; (5) "waiver, estoppel, and laches"; (6) failure to mitigate; (7) the product failed to perform; (8) set off; (9) "Purity Water has not interfered with possession of PD-206"; (10) "Purity Water has not exercised dominion and/or control over the PD-206"; and (11) failure to join indispensable parties.

Purity also asserted a counterclaim for breach of contract based on product defect, alleging that: (1) Purity subcontracted with Purolite to provide resin that would reduce the water content in the biodiesel product, rendering the product marketable as fuel; (2) Purolite produced a defective resin, which was used in the Biodiesel Dunhill Terminal Project, and which "failed to perform its essential purpose" pursuant to the contract between Purity and Purolite; (3) as a direct and proximate result of the failure, Purity has not been paid by Vertex and others; (4) therefore, Purolite breached the contract and Purity sustained damages.  More specifically, Purity alleged that: (1) Purolite was to provide resin that would reduce the water content in the biodiesel product to the initial goal of 100

---

[1] As noted, Purity Water's later-filed motion to change venue has been denied.  Docket no. 40.

ppm of water, rendering the biodiesel marketable as fuel at the highest market price and meeting certain specifications; (2) Purolite claimed that its product would achieve the purpose of removing water in order for the biodiesel to contain 100 ppm of water, as the parties involved in the Dunhill Terminal Biodiesel Project required; (3) Purolite's product did not achieve the purpose of removing water in order to reach the initial goal of 100 ppm or the modified goal of 250 ppm; (4) Purolite provided resin that was used in the Biodiesel Dunhill Terminal Project and the resin failed to perform its essential purpose pursuant to the contract; (5) the parties involved in the Dunhill Terminal Biodiesel Project consulted with Purolite prior to and during the project regarding the performance and design of the system; and (6) as a direct and proximate result of the failure of the resin produced by Purolite to achieve its essential purpose, Purity Water has not been paid by the parties involved in the Dunhill Terminal Biodiesel Project.

## C. The Court's Order on Partial Summary Judgment

On July 14, 2009, this Court granted Purolite's motion for partial summary judgment on Purity Water's counterclaim. In its Order, the Court noted that the contract, being for the sale of movable goods, is governed by the UCC. *See Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60 & n.3 (Tex. 2008); TEX. BUS. & COM. CODE §§ 2.101-.725; ALA. CODE 1975 § 7-2-102; *see also Glenn Thurman, Inc. v. Moore Const., Inc.*, 942 S.W.2d 768, 771 (Tex. App.–Tyler 1997, no pet.) ("When parties enter into a contract for the sale of goods, [the UCC] controls the conduct of the parties. Where the U.C.C. applies, it displaces all common law rules of law regarding breach of contract and substitutes instead those rules of law and procedure set forth in the U.C.C.").[2]

---

[2] As before, the parties do not address what law governs the contracts at issue. Since both parties appear to assume that Texas law applies and neither party objected to this Court's previous application of Texas law, the Court will apply Texas law.

Neither party has disputed the Court's conclusion that the contract at issue would be governed by the UCC.[3]  The Court further noted that, under Texas law, Purity's claim was more properly characterized as one for breach of express warranty or an implied warranty of merchantability based on a manufacturing defect rather than breach of contract, though certain breach of warranty claims may be based in contract.[4]  Regardless of how the claim should be characterized, the Court

    [3] Despite this fact, neither party briefs the current motion for summary judgment in terms of the UCC.  The Court notes that analysis of the issues has been made unnecessarily difficult by the parties' failure to cite to appropriate provisions of the UCC that would relate to their arguments, and by the parties' failing to take clear positions with regard to certain issues.  Specifically, the Court notes that the UCC places great emphasis on whether goods are finally accepted or whether they are rejected and/or acceptance revoked.  Purity Water never asserts that it did not accept the goods or that it revoked acceptance of the goods.  Accordingly, the Court has proceeded on the assumption that the goods were accepted. Whether the goods were accepted or not, however, the only basis that Purity Water has given throughout the litigation for its failure to pay is that the PD-206 was defective.  But the Court has already concluded in its order granting summary judgment on Purity Water's counterclaim that Purity Water failed to raise a fact issue on the existence of a defect because product failure alone is not proof of defect, Purity Water failed to show proper use, and Purity Water failed to account for other possible causes of the product failure.  In addition, as discussed more fully below, Purolite, the party with the burden on the proof of the existence of a contract, fails to clearly set forth the facts of contract formation, including whether it bases its claim on an oral or written contract.  Its only reference to the UCC appears on page 9 of its Reply brief, where it states that "Purity Water made an offer to purchase the PD-206 that Purolite accepted by shipping the PD-206," and "[t]his formed a binding contract."  However, its Complaint asserts that there were both "oral and written orders" by Purity Water for the resin, Compl. ¶ 19, and, at least with respect to the second shipment, Purolite's own evidence indicates that there was an oral agreement, after which Purity Water sent its purchase order.

    [4] Under Texas law, courts generally regard claims for breach of contract and breach of warranty as distinct causes of action, though claims for breach of express warranty are contractual in nature. *Med. City Dallas v. Carlisle Corp.*, 251 S.W.3d 55, 60 (Tex. 2008) ("[W]hile an express warranty is a distinct claim, it is nonetheless a part of the basis of a bargain and is contractual in nature."). *See* Tex. Bus. & Com. Code § 2.313(a)  The remedies for breach of contract are set forth in section 2.711, and are available to a buyer "[w]here the seller fails to make delivery" or where the goods are rejected or acceptance is revoked.  Tex. Civ. Prac. & Rem. Code § 2.711(a); 2.608.  The remedies for breach of warranty are set forth in section 2.714, and are available to a buyer who has accepted goods, but discovers that the goods are defective in some manner.  *Id.* § 2.714, 2.711 cmt. 1.  Once a buyer has accepted the goods and can no longer revoke that acceptance, it is limited to recovering under section 2.714 of the UCC for breach of warranty if the goods are defective or

concluded that the issue presented was whether Purity had raised a material fact issue on the existence of a product defect, which was the basis for its counterclaim. The Court found that it had not, and granted summary judgment in favor of Purolite on the counterclaim.

## D. Purolite's current motion and contentions

After the Court's order on Purity Water's counterclaim, Purolite moved for leave to file a motion for summary judgment on its breach-of-contract claim, docket no. 80, which this Court granted by text order. Purolite moves for summary judgment on the basis that Purity's sole defense for non-payment, the alleged product defect, has now been extinguished by the Court's order, and thus it is entitled to summary judgment on its breach-of-contract claim.

Plaintiff Purolite asserts that its evidence proves as a matter of law that Purity ordered, received, and used the resin in question. Purolite notes that Purity's counterclaim in this lawsuit and its claims for payment in its related lawsuit against the third partes "presuppose" the ordering, receipt and use of Purolite's resin, given that Purity asserts that it performed in the Alabama lawsuit and is entitled to payment.

Purolite asserts that the invoices show that Purolite sold the PD-206 to Purity Water for shipment to the Dunhill Terminal, and that Carrera testified that the PD-206 was "ordered by and for and received by Purity Water; that the prices for the PD-206 and delivery and other charges contained therein were agreed to; and that the Purolite resin was sold to and for Purity Water." Purolite asserts that there is no evidence that the resin was defective or failed to perform adequately,

---

nonconforming. *See Brooks, Tarlton, Gilbert, Douglas & Kressler v. U.S. Fire Ins. Co.*, 832 F.2d 1358, 1374-75 (5th Cir. 1987); *Leggett & Platt, Inc. v. Yankee Candle Co.*, 2008 WL 723582, at *5 (N.D.Tex. Mar.18, 2008); *Sw. Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 575 & n. 2 (Tex. 1991). Thus, whether a buyer accepts the goods determines the remedies available to the buyer.

and that any failure in purification of the biodiesel was due to Purity's misuse of the resin. Purolite asserts that it provided Purity Water and the third parties with written information regarding the proper and recommended use of PD-206, including that the purification vessels be set up in a series as a lead-lag system, and that the biodiesel should not be recirculated, and the evidence shows that Purity and the third parties received Purolite's technical bulletin concerning instructions regarding the proper use of the resin. Nevertheless, Purolite asserts, Purity and the third parties decided to use a recycle system, and "Purity Water did not even discuss with its business partners if the purification vessels should be set up in series, or as a recycle system." Purolite contends that, had Purity directed the biodiesel into a lag vessel instead of recycling it, it would have further reduced the water content of the biodiesel.

## E. Defendant's Summary-Judgment Evidence and Arguments

Purity Water contends that "Purolite has not produced a contract setting forth an agreement with Purity Water," that "the invoices are not the contract," and that "Purolite has not presented any evidence stating the terms of the agreement." Purity Water further argues that "Purolite has not produced any evidence that its product performed as per an agreement." Purity contends that Purolite has not produced evidence that its product fulfilled the terms of the contract, but there is evidence that it did not reduce the water ratio to 100 ppm as per the contract.

Purity contends that this "matter is much more involved" than Purolite makes it appear. Purity asserts that Jason Gehrig introduced the Vanderlindens to Cowart and Wallace in 2007, and when Cowart learned of the biodeisel at the Dunhill Terminals, he contacted the Vanderlindens. Purity contends that, before its involvement in the Dunhill Project, Ramesh Ganesan of Purolite contacted Gehrig and Neatherly in November 2006 and informed them that the price for PD-206 was

$6/pound. Purity Water contends that Purolite had a relationship with the Dunhill third parties before Purity Water's involvement. Purity asserts that Gehrig referred Purity to the Vanderlindens, who then contacted Purity in May 2007 regarding the Dunhill Project. Purity contends that it "took directions directly from the [Dunhill third] Parties," and that the Dunhill third parties informed Purity that the biodiesel water ratio needed to be 100 parts per million ("ppm"). Purity Water asserts that Purolite was also informed that the water ratio needed to be at 100 ppm, that Purolite "shared its knowledge and was involved in discussions, and directly communicated with the [Dunhill third] Parties regarding the Dunhill" project before and during the project, that Purolite agreed to produce a product for the Dunhill third parties that would reduce the water ratio to 100 ppm, and that "[t]he Parties agreed [to] purchase Purolite's product that would reduce the water ratio to 100 ppm." Purity contends that certain Dunhill third parties and Purolite reached an agreement on July 10, 2007 in which Purolite agreed to produce a product that would reduce the water to 100 ppm and the Parties agreed to purchase the product, and thus "the Parties" (defined by Purity Water as Doug and Glenn Vanderlinden, Jason Gehrig, VQuip, and Optimira Energy) ordered 30,000 pounds of PD-206 from Purolite. Purity notes that Purolite asserted in its Pennsylvania complaint that VQuip acknowledged, agreed, and negotiated the orders for the PD-206.

Purity Water further asserts that Purolite has failed to show that its product fulfilled the terms of the contract, that Purolite failed to produce and deliver the initial amount ordered as per the agreement, and that the Dunhill third parties, not Purity, specifically negotiated how to proceed when Purolite was unable to produce and deliver the initial amount ordered. Further, Purity contends that the Dunhill third parties and Purolite also directly negotiated the price and quantity for an order of resin and the Parties specifically authorized orders. Purity states that the Parties

authorized a shipment on July 12, 2007, and that Purity did not negotiate or agree to the shipment of 13,420 pounds delivered around July 26, 2007. Purity contends that Carrera did not concede that he ordered the resin in his deposition, but merely read the invoices. Purity asserts that it does not have an account for stated terms with Purolite and has not agreed to any terms stated on Purolite's invoices, which "are not contracts" and "do not set forth the terms and conditions of agreement to purchase Purolite's product." In paragraph 12 of its response, Purity states that "[o]rders placed regarding the PD-206 were placed by Purity Water and other Parties."

Purity also asserts that the resin failed to perform and that the Parties informed Purolite of the failure. Purity contends that the product did not perform and was not sold on the desired market, and that though the parties used the resin in another project, it was while the Dunhill project was still processing, and Purolite's product was not used after that. Purity further asserts that it did not misuse the resin, and states that Purolite was involved in the discussions regarding how the equipment would be assembled and the goals regarding the biodiesel, and was also on site at Dunhill. Purity contends that it did not design the purification system, nor did it determine the equipment or materials needed, but that those matters "were determined and controlled by the Parties."

Purity also contends that Purolite failed to mitigate its damages because it did not retrieve the resin, but instructed Purity to have the resin returned to Dunhill when en route to Purolite. Purolite also asserts that Purolite failed to join indispensable parties because other parties ordered the product and Purolite submitted an invoice to Purity, but there is evidence that Purolite attempted to collect the amount it claims it is owed from the other Parties, such that there is a jury question whether Purity Water is responsible for orders placed by the other Parties.

**F. Purolite's Request to Strike Carrera's affidavits**

Purolite objects to and moves to strike Carrera's affidavits, arguing that they are not competent summary-judgment evidence. Purolite asserts that Carrera has previously signed a false affidavit in this case in support of Purity's motion to transfer, and claims that the new affidavits likewise contain falsehoods. Specifically, Purolite points to paragraph 9 of Carrera's affidavit, in which he states that "The Parties [defined as Doug Vanderlinden, Glen Vanderlinden, VQuip, Inc. and Optimira Energy, Inc.] and Purolite directly negotiated the price and quantity for an order of resin and the Parties specifically authorized orders." Purolite argues that Purity's own purchase orders show that it, not the Parties, ordered the PD-206, and in the specific quantities and at the set prices that Purolite is claiming against it. Pl. Ex. B. Purolite also points to Carrera's deposition testimony, in which he testified that he ordered the first 30,000 pounds of PD-206, and that he was present for the order of the final 13,400 pounds, and had authorized that the order for that quantity and at that price be made on his account. Pl. Ex. A, Carrera depo at 60-65. Purolite also contends that Carrera's claim that Purolite agreed to provide a resin that would reduce the water content of the biodiesel to 100 ppm is not supported by any writing, "[n]or are there any specifics offered as to when or under what circumstances such an agreement was reached." Plaintiff Purolite further contends that the affidavits fail to satisfy Rule 56 because they raise a fact for the first time – that Purolite allegedly represented that the resin would reduce the water level in the biodiesel to 100 ppm – but fail to attach any paper or writing that purports to be a contract or warranty, and because Carrera fails to show how he has personal knowledge of this "bald assertion." Because he never made this unsupported assertion before, Purolite argues, he cannot now create a fact issue by making the assertion in his summary-judgment response. Last, Purolite contends, Carrera's affidavits are

conclusory and lack any factual support.  The Court need not rule on the motion to strike because, even considering Carrera's affidavits, the result is the same.

## G. Breach of Contract

In order to recover on a breach-of-contract claim, the plaintiff must prove (1) the existence of a valid contract binding the parties in the action, (2) plaintiff's performance under the contract, (3) the defendant's nonperformance or breach, and (4) damages as a result.  *Southwell v. University of the Incarnate Word*, 974 S.W.2d 351, 354-55 (Tex. App.-San Antonio 1998, pet. denied); *see also State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 303 (Ala. 1999).

### 1. Existence of a valid contract binding on the parties

In its response, Purity argues that Purolite has not produced a contract setting forth an agreement with Purity, and that the invoices are not the contract.  Purity argues that Purolite has not presented any evidence stating the terms of an agreement, including the alleged representation by Purolite that the PD-206 would reduce the water content of the biodiesel to 100 ppm, and contends that there are fact issues regarding whether Purity may be held responsible for the payment for the PD-206 that was ordered.

Purity has not previously contended that it did not contract with Purolite for the resin.  In fact, as noted by Purolite, Purity Water's counterclaim – for breach of contract – presupposes the existence of a contract between Purity and Purolite.  Further, it expressly asserts that "Purity Water subcontracted with Purolite to provide resin," that Purolite produced a defective resin, and that "[t]herefore, Purolite breached its contract with Purity Water."  Counterclaim, docket no. 19, ¶¶ 58-60.  Thus, Purity Water cannot seriously contend that it did not contract with Purolite for some amount of resin.  The only real questions are whether Purity Water contracted for the second

shipment of resin and whether Purolite made an express warranty regarding the PD-206's ability to remove water from the biodiesel.

Purolite contends that the existence of the contract to purchase the PD-206 is established by Purity Water's purchase orders to Purolite, Purolite's invoices to Purity Water for the PD-206, Purity Water's invoices to Optimira Energy and Doug Vanderlinden for the PD-206 and shipping charges, and the deposition testimony of Wes Carrera. Specifically, Purolite points to Purity's purchase orders for the PD-206, which Purolite contends show that "Purolite is the vendor, and that Purity Water itself placed the purchase orders, at $5.25 and $4.80 per pound, just as is set forth on Purolite's invoices to Purity Water."

Citing Texas Business & Commerce Code § 2.206, Purolite contends that Purity made an offer to purchase the PD-206 via its purchase orders, which Purolite accepted by shipping the PD-206, and this formed a binding contract. Purolite further asserts that Carrera admitted ordering and receiving the PD-206 for the Dunhill Terminal Project, in the amounts and prices set forth on the invoices, which correlate with Purity's purchase orders. Purolite asserts that Carrera testified that he did order and receive the first two shipments, and that the third shipment was negotiated in his presence by Doug Vanderlinden,[5] and that it was ordered and received. Carrera acknowledged that he did not suggest that some other person or entity be billed or be responsible for paying the bills. Purolite argues that the purchase orders belie Purity's contention that it did not order or have ordered for it the PD-206 at issue. Purolite also points to Purity Water's invoices to Doug Vanderlinden/Optimira Energy, as a business record admission that Purity Water had purchased the

---

[5] Carrera has testified that he "took [his] directions directly from V-Quip and Doug Vanderlinden." Carrera depo at 20.

PD-206 for resale, with a markup.

Under the UCC, a contract may be made in any manner showing agreement, including conduct by both parties that recognizes the existence of such a contract. TEX. BUS. & COM. CODE § 2.204. Further, "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods ...." TEX. BUS. & COM. CODE § 2.206(a)(2). Purolite asserts that the sales agreement is set forth in the two purchase orders and three invoices, which show Purity Water as Purolite's contracting customer, as well as the price per pound, delivery charges, and the obligation to pay interest on any unpaid principal balance.

Purity Water has repeatedly admitted that it sub-contracted with Purolite for the resin in order to fulfill its contractual obligations to the Dunhill third parties. This fact is consistent with Carrera's current assertions that he took his orders from VQuip, and that the Dunhill third parties negotiated for and authorized the purchase of the additional resin. These new assertions do not necessarily raise a fact issue on whether Purity subcontracted with Purolite for the resin but instead are equally consistent with that conclusion. Further, Carrera's affidavit submitted in support of Purity Water's motion to transfer venue states, "In Mobile County, Alabama, Purity Water and Purolite agreed upon the price, quantity, the place of shipment, and when the product was to be shipped." Affidavit ¶ 6.

In addition, all the documentary evidence supports the existence of a sales contract between Purity Water and Purolite as alleged by Purolite. It is undisputed that Purity Water sent to Purolite a July 10, 2007 purchase order for 30,000 pounds of PD-206 at $5.25 per pound to be shipped to Purity Water for its customer Optimira Energy. Reply, Exhibit B. It is undisputed that Purolite

16

shipped 30,000 pounds of PD-206, in two separate shipments, and sent two separate invoices reflecting the sale to Purity Water. Carrera acknowledged at his deposition that the July 11, 2007 invoice was the one he received. Carrera depo. at 55. Carrera never objected to the invoices or asserted that Purity Water was not the one who ordered the PD-206 or was responsible for payment. Carrera also admitted that he sold to Vanderlinden at Optimira the PD-206 for which he was billed by Purolite, with a markup on both the PD-206 and the shipping charges. Carrera depo at 72-73.[6]

The summary-judgment evidence indicates that, after the Dunhill third parties used the original resin shipment, a sufficient amount of water had not been removed from the biodiesel. Ramesh Ganesan of Purolite went to the site, and "detected a lot of things that were wrong with the system," including the vessel design and the fact that it was recycled. The evidence does reflect a July 25 email from Doug Vanderlinden to Glenn Vanderlinden, Wes Carrera, and others "to confirm immediate po for up to 13,000 lbs @ $5.10 per lb." concluding with "Glenn pls authorize by return email to all parties." Glenn Vanderlinden emailed back "This is agreeable to Greenfield and Optimira and we will process PO's accordingly and schedule payment accordingly." It is undisputed that the additional shipment of resin was negotiated via a conference call between Jacob Brodie of Purolite, Ramesh Ganesan of Purolite, Wes Carrera of Purity Water, and Doug Vanderlinden of Optimira. Brodie depo at 69; Carrera depo at 59. Carrera acknowledged that "[i]t [the PD-206] was sold to us" and that Purity Water "was the company, I guess, of record at that time." Carrera depo at 59-60. Carrera admitted that he did not tell Vanderlinden that he was not buying it, nor did he say

---

[6] The uncontroverted evidence includes Purity Water's July 10, 2007 quote for and July 18, 2007 invoice for 15,180 pounds of PD-206 at 6.00 per pound (with a 5% discount) to Optimira, as well as a July 11, 2007 quote and July 18 invoice for 14,820 pounds of PD-206 at 6.00 per pound (with a 5% discount).

"you have to bill somebody else, not Purity Water." Carrera depo at 60. When asked, "what, if anything, [he] did to make it clear to at least Purolite that this July 25 order, even though it's going to be sold to Purity Water, is somebody else's responsibility, not ours?" Carrera responded, "I did not make any – any reference to that at all." Carrera depo at 61. Further, regardless of whether Doug Vanderlinden actually negotiated the purchase, the evidence shows that Purity Water then submitted a purchase order (number 53411) by email to Purolite on July 25 for 12,000 to 13,000 pounds of PD-206 at the discounted price of $4.80. Exhibit P-7 to Carrera depo. The purchase order was emailed by Martha Curry of Purity Water, who Carrera testified is "our office staff administrative assistant." Carrera depo. at 141. Carrera recognized it as the Purity Water purchase order. Carrera depo. at 62. Carrera admitted that he "had a purchase order to Purolite" and that, in the purchase order, he was "telling Purolite to ship it to Optimira Energy in Mobile, Alabama." Carrera depo at 63-64. Thus, the undisputed evidence is that, after whatever negotiations took place, Purity Water sent a purchase order to Purolite. Further, Carrera acknowledged invoicing Doug Vanderlinden at Optimira for the additional order of resin, this time giving a 15% discount "based off of the negotiation that Ramesh and he did negotiating the lower terms." Carrera depo at 76.

Though contract formation is generally a question of fact, summary judgment is appropriate when no material fact issues exist. *Delta Brands v. Wyson & Miles*, 203 F.3d 828 (5th Cir. 1999) (unpublished). Purity Water's own counterclaim asserts that Purity Water subcontracted with Purolite to provide resin. The purchase orders, Carrera's testimony, and the other documentary evidence unquestionably demonstrate Purity Water's placement of the orders for the resin and Purolite's shipment of the resin in response. Purity Water does not dispute that it sent the purchase orders, received Purolite's invoices, and then sent its own invoices to the Dunhill third parties as part

of its resale of the resin. Purity Water's belated attempt to create a "dispute about the party responsible for payment of the orders" fails. Purolite has provided uncontroverted evidence of a contract for the sale of the resin at the prices listed on the purchase orders and invoices, and Purity Water fails to raise a material issue of fact regarding the existence of the contract for the sale of resin.

Two issues remain to be addressed, however. First, to the extent Purity Water argues that the invoices are not the contract and that there was instead an oral contract for the sales of resin negotiated by the Dunhill third parties, the UCC, TEX. BUS. & COM. CODE § 2.207(c), provides that "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title." Thus, the terms of the contract would be the terms in the purchase orders and invoices insofar as they agree. The only difficulty then is the fact that the second purchase order is an order for 12,000 to 13,000 pounds of PD-206, whereas the invoice reflects a shipment of 13,420 pounds. Further, even if, as part of the negotiations or even in formation of an oral contract, Purolite made an express warranty that the PD-206 would reduce the water content to 100 ppm, the Court previously ruled that Purity Water failed to raise a fact issue on breach of the express warranty, and thus the existence of the express warranty is not a material fact issue.

Second, Purolite contends that the provision on its invoices, which state that "[a] service charge of 1.5% per month will be added to all past due accounts," is part of the contract and that it is entitled to recover this interest as a result of Purity Water's breach. Purolite fails to address how

this provision became a part of the contract, however.  Some guidance is provided by section 2.207

of the Texas UCC, which provides in part:

> (a) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (b) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
>> (1) the offer expressly limits acceptance to the terms of the offer;
>> (2) they materially alter it; or
>> (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

The comments state that "[t]his section is intended to deal with two typical situations. The one is the

written confirmation, where an agreement has been reached either orally or by informal

correspondence between the parties and is followed by one or both of the parties sending formal

memoranda embodying the terms so far as agreed upon and adding terms not discussed.  The other

situation is offer and acceptance, in which a wire or letter expressed and intended as an acceptance

or the closing of an agreement adds further minor suggestions or proposals . . . ." TEX. CIV. PRAC.

& REM. CODE § 2.207 notes.   "Under this Article a proposed deal which in commercial

understanding has in fact been closed is recognized as a contract. Therefore, any additional matter

contained in the confirmation or in the acceptance falls within subsection (2) and must be regarded

as a proposal for an added term unless the acceptance is made conditional on the acceptance of the

additional or different terms." *Id.*  "Whether or not additional or different terms will become part

of the agreement depends upon the provisions of subsection (2).  If they are such as materially to

alter the original bargain, they will not be included unless expressly agreed to by the other party.

If, however, they are terms which would not so change the bargain they will be incorporated unless

notice of objection to them has already been given or is given within a reasonable time." *Id.*

The interest clause was placed on Purolite's invoices to Purity Water for the resin. As noted, Purolite does not take a clear position on whether there was an oral agreement, confirmed by the purchase order and invoice, or whether the purchase order and acceptance by shipping formed the contract, or whether both occurred with respect to the two different orders. However, in either event, it must satisfy subsection (2). According to the UCC comments, "[e]xamples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are . . . a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for . . . ." TEX. CIV. PRAC. & REM. CODE § 2.207 notes. This provision only applies, however, to contracts "between merchants." In the UCC, "between merchants" means in any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants, and "merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." " TEX. CIV. PRAC. & REM. CODE § 2.104.

It appears undisputed that Purolite is a merchant under the UCC, but it is not clear that Purity Water is, and neither party addresses this issue. Though the Court is inclined to conclude that Purity Water is a merchant, the Court again notes that neither party addresses any relevant UCC provisions, and Purolite has not cited § 2.207 nor provided any argument or evidence concerning whether Purity Water is a merchant. Accordingly, Purolite has not established as a matter of law that it is entitled

to the interest charges set forth on its invoice, but the Court will consider any arguments or evidence on this issue submitted at the pretrial conference.

Thus, at this time, Purolite has established as a matter of law that there was a contract for sale of the resin between Purity and Purolite, but has not established that the contract included the additional 420 pounds of resin in the second shipment or that the interest clause became part of the contract.

## 2. Plaintiff's performance under the contract

Plaintiff has submitted evidence that it shipped the PD-206 that was ordered and the resin worked (though it was misused). Purity Water argues that the PD-206 was defective and "failed to perform its essential purpose." However, this Court has already granted summary judgment on Purity Water's defect claims, noting that Purity Water was unable to raise a fact issue on its claim that the PD-206 was defective. Accordingly, Purolite has established this element of its claim.[7]

## 3. Purity Water's breach

This element of Purolite's claim is established as a matter of law. Purity Water admits that

---

[7] Further, Purolite asserts that Purity's counterclaim based on an alleged defect in the PD-206 fails as a matter of law "because the biodiesel was in fact dewaterized and sold for in excess of $5.6 million." Purolite asserts that Purity's claim fails because there is no evidence that the resin was defective. Purolite points to the testimony of Purity's Chief Operating Officer, Wesley Carrera, who testified that the biodiesel dewatered with Purolite's resin was in fact sold, and to the fact that "Purity Water's Dunhill Terminal business partners solicited Purolite and Purity Water's Chief Operating Officer to use Purolite's PD-206 resin to dewater ten railroad cars of biodiesel in Houston, Texas, one week after the Dunhill Terminal biodiesel was sold." Purolite contends that the fact that the biodiesel sold necessarily establishes that the biodiesel had been rendered marketable and that the resin had performed its essential purpose. Purolite also points to Purity's allegations against Vertex and others in the suit filed by Purity in Alabama, in which Purity alleges that it contracted to remove water and other elements from the raw biodiesel, and that it performed all of the obligations and conditions under the contract. Purolite contends that there is no evidence that any alleged defect in the resin, or anything else that Purolite did or did not do, caused Purity's business partners to refuse to pay Purity.

it has not paid Purolite any amount for the resin.

### 4. Purolite's damages

Purolite claims it is entitled to damages in the amount of the contract sum of $230,611.00, plus interest accruing per the contract on the unpaid balance at 1.5% per month ($3,459.17 at the time of filing the motion), and attorney's fees as provided for by Texas Civil Practice & Remedies Code § 38.001. As noted, Purolite has failed to establish that it is entitled to the contract interest or the entire amount of the purchase price.

Further, Purity Water asserts as an affirmative defense that Purolite failed to mitigate its damages because it did not retrieve its spent resin. The mitigation-of-damages doctrine requires an injured party, following a breach, to exercise reasonable care to minimize his damages if it can be done with slight expense or reasonable effort. *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995); *see also Gunn Infiniti v. O'Byrne*, 996 S.W.2d 854, 857 (Tex. 1999) ("Under mitigation principles, the long-standing law of this state requires a claimant to mitigate damages if it can do so with "'trifling expense or with reasonable exertions."). The party asserting failure to mitigate has the burden of proving facts showing lack of such mitigation and must also show the amount by which the damages were increased by failure to mitigate. *Cotten v. Weatherford Bancshares*, 187 S.W.3d 687, 708 (Tex. App.–Fort Worth 2006, pet. denied).[8]

---

[8] Recently, in the context of a suit for breach of an insurance contract, the Fifth Circuit made an *Erie* guess concerning whether mitigation of damages is a condition precedent to recovery or an offset. *Carrizales v. State Farm*, 518 F.3d 343 (5th Cir. 2008). The Court noted that, "[i]n general, the duty to mitigate damages is an equitable doctrine, and means a reduction in the amount of damages, not an affirmative defense." *Id.* at 350 (citing 25 C.J.S. Damages § 167 and *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 225 (Tex. App.– San Antonio 1999, no pet.). It further noted that Texas Rule of Civil Procedure 94 does not list mitigation of damages as an affirmative defense, and that "Texas applies the principle that the failure to mitigate damages is an offset against damages in the deceptive trade practices ('DTPA'), employment and landlord-tenant contexts." *Carrizales*,

Purity Water asserts that "[t]he resin used in the Dunhill Terminal Biodiesel [Project] had a value" and "Purolite did not retrieve the resin" but rather "instructed Purity Water to have the resin returned to Dunhill Terminals when en route to Purolite." Purity Water further asserts that "[i]t is a jury question to determine whether Purolite should have mitigated its damages and adjust the amount of damages if any is to be awarded."

Purity Water cites to its exhibits 5 and 13 in support of its mitigation argument. Exhibit 5 is Wes Carrera's affidavit, but it does not appear to address the mitigation issue. Exhibit 13 is a November 2007 email chain. There is a November 19, 2007 email from Glenn Vanderlinden to Wes Carrera asking for information regarding shipping the resin back to Purolite. There is also a November 20, 2007 email from Ramesh Ganesan of Purolite to Wes Carrera and Glenn Vanderlinden, with copy to Jacob Brodie of Purolite. It instructs Carrera and Vanderlinden to speak with Jacob Brodie "before shipping the resin back to us for regeneration," noting that the plant cannot accept resin without a Return Material Authorization form. Ganesan states that the RMA is "typically issued by us after reviewing everything and making sure that we have all the appropriate documentation and confirm that the resin is safe to bring back to our plant for regeneration. We also need to have a confirmed P.O. authorizing us to provide the regeneration services." The email concludes, "So please speak with Jacob Brodie for all the necessary arrangements before you ship the resin back to us."

---

518 F.3d at 350. This Court likewise concludes that, though Texas courts sometimes refer to mitigation as an affirmative defense, it is not a condition precedent to recovery on Purolite's breach-of-contract claim, but rather an offset to the amount of damages that Purolite can recover. *See* RESTATEMENT (SECOND) CONTRACTS § 350 (characterizing avoidability as a limitation on damages, and noting that "[t]he amount of loss that he could reasonably have avoided by stopping performance, making substitute arrangements or otherwise is simply subtracted from the amount that would otherwise have been recoverable as damages.").

Jacob Brodie of Purolite testified that the contract between Purity Water and Purolite was a "simple purchase of the material," and that Purity Water has not paid for the material or "returned the material under [Purolite's] protocols."  Brodie depo at 45.  Brodie further stated that Purity Water had not submitted the proper protocols, including the purchase order, for the return" of the resin, so that as far as Purolite was concerned, "they still own it."  *Id.*  Brodie testified that Purolite had gotten calls about returning the material, and acknowledged that Purolite refused shipment because Purity Water did not follow the proper safety protocols.  *Id.* at 45-46.  Brodie explained the return protocol, including the requirement that a sample be provided so that Purolite could verify that it is nonhazardous so that it could be packaged and shipped properly, and the requirement of a purchase order for regeneration.  *Id.* at 46-47.  Brodie testified that no sample was submitted.  Brodie further testified that Purolite did not make any attempts to retrieve the resin because, once Purolite realized it was not going to be paid, "taking the material back didn't do us any good really."  Brodie also testified that there was a dispute about who owned the resin, stating that when someone called (presumably Doug or Glenn Vanderlinden) and wanted to return it, Carerra informed Purolite that they did not own it.  *Id.* at 52.

Purity Water does not dispute that it failed to follow safety and other protocols for returning the resin or that Purolite had doubts about who owned the resin, and thus fails to demonstrate that it was unreasonable for Purolite to refuse the shipment.  Further, given the apparent ambiguity about ownership of the resin, Purity Water has failed to show that it would have been reasonable for Purolite to attempt to seize or otherwise obtain the resin absent its usual protocols.  Nor has Purity Water shown that retrieving the resin would have involved only minimal expense.  Thus, the Court finds that Purity Water has failed to raise a fact issue on mitigation of damages.

## H. Failure to Join Indispensable Parties

Purity Water asserts that Purolite failed to join certain Dunhill third parties (Doug and Glenn Vanderlinden, VQuip, Optimira, and Jason Gehrig), and that those parties are indispensable. Determining whether to dismiss a case for failure to join an indispensable party requires a two-step inquiry. *Hood ex rel. Mississippi v. City of Memphis, Tenn.*, 570 F.3d 625, 628 (5th Cir. 2009). First, the court must determine whether the party should be added under the requirements of Rule 19(a). Rule 19(a)(1) requires that a person subject to process and whose joinder will not deprive the court of subject-matter jurisdiction be joined if: "(A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." If a person who qualifies under Rule 19(a) cannot be made a party because, for example, joinder would destroy subject-matter jurisdiction, a federal court must determine whether that person is "indispensable." In making this determination, the court should consider:

> first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

FED. R. CIV. P. 19(b). The Rule 19(b) inquiry is not necessary if the Rule 19(a) requirements are not satisfied.

With regard to the first step of the analysis, the burden is on the party raising the defense to

26

show that the person who was not joined is needed for a just adjudication. WRIGHT & MILLER, FED. PRAC. & PRO. § 1609. Under Rule 19(a)(1)(A), we ask whether complete relief may be accorded to those persons named as parties to the action in the absence of any unjoined parties; what effect a decision may have on absent parties is immaterial. *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 313 (3d Cir. 2007) (citing *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996) ("Completeness is determined on the basis of those persons who are already parties, and not as between a party and the absent person whose joinder is sought.")). Plaintiff Purolite has sued Purity Water for breach of contract, unjust enrichment, and conversion. If the Court were to find in favor of Purolite on all its claims, it could afford complete relief. Even where an absent party might be jointly and severally liable with the named defendant (and even when they are joint tortfeasors), courts may still afford complete relief as between the plaintiff and the named defendants. *Gen. Refractories*, 500 F.3d at 314. With regard to Rule 19(a)(1)(B), the Dunhill third parties are not claiming an interest relating to the subject of this action and Purity Water has failed to show that disposing of the action in their absence may impair or impede their ability to protect the interest or would leave Purity Water subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest. Thus, the Court finds that the third parties are not required parties and their joinder is not mandated.

**Conclusion**

Purolite's Motion for Summary Judgment on its Contract Claim (docket no. 81) is GRANTED IN PART. The parties should be prepared to argue and present evidence on the remaining issues of the additional 420 pounds of resin and the interest clause at the pretrial conference.

It is so ORDERED.

SIGNED this 21st day of January, 2010.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE